**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No.**

QUINTON VALENTINE, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

                    v.

IBOTTA, INC.,
BRYAN LEACH,
SUNIT PATEL,
STEPHEN BAILEY,
AMANDA BALDWIN,
AMIT N. DOSHI,
THOMAS LEHRMAN,
VALARIE SHEPPARD,
LARRY W. SONSINI,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
BOFA SECURITIES, INC.,
EVERCORE GROUP L.L.C.,
UBS SECURITIES LLC,
WELLS FARGO SECURITIES, LLC,
CITIZENS JMP SECURITIES, LLC,
NEEDHAM & COMPANY, LLC, and
RAYMOND JAMES & ASSOCIATES, INC,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATION OF**
**THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

Plaintiff Quinton Valentine ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Ibotta, Inc. ("Ibotta" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Ibotta; and (c) review of other publicly available information concerning Ibotta.

## NATURE OF THE ACTION

1.    Plaintiff Quinton Valentine brings this Action for violations of the federal securities laws.

2.    Plaintiff brings this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") on behalf of all persons or entities that purchased or acquired Ibotta securities pursuant or traceable to the Company's Registration Statement on Form S-1 (including all amendments made thereto) and related prospectus on Form 424B4 (collectively, the "Offering Documents") issued in connection with Ibotta's April 18, 2024 initial public stock offering (the "IPO" or the "Offering") (the "Securities Act Class", and together with the Exchange Act Class (defined below), the "Class"). On April 17, 2024, the SEC declared effective the final registration statement on Form S-1, and the following day, the Company filed the final prospectus for Ibotta's IPO, making available 6,560,700 shares of Class A Common Stock to the investing public at $88

per share. Plaintiff brings the Securities Act claims against Ibotta, the Individual Defendants (defined below), and the Underwriter Defendants (defined below) (collectively, the "Securities Act Defendants", and together with the Exchange Act Defendants (defined below), "Defendants").

3.      Plaintiff also brings this federal securities class action under §§10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased Ibotta securities between April 18, 2024, and February 26, 2025, inclusive (the "Class Period") and who were damaged thereby (the "Exchange Act Class"). The Exchange Act claims are brought against Defendants Ibotta, Bryan W. Leach ("Leach"), Thomas Lehrman ("Lehrman"), and Sunit S. Patel ("Patel") (collectively, the "Exchange Act Defendants").

## <u>SUMMARY OF THE ACTION</u>

4.      Ibotta is a technology company that allows consumer packaged goods ("CPG") brands to deliver digital promotions to consumers through a single network called the Ibotta Performance Network ("IPN").

5.      Throughout the Class Period, Defendants made false and misleading statements and omissions that concealed from investors that (1) Ibotta's data measurement system did not provide accurate, precise, and real time client campaign and consumer data measurement; (2) the Company's business mix had shifted and was generating less revenue; and (3) Ibotta had "exhausted" its clients' budgets, negatively impacting fourth quarter 2024 revenue and expected first quarter 2025 revenue.

## JURISDICTION AND VENUE

6.      The Exchange Act claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

7.      The Securities Act claims asserted herein arise under and pursuant to §§11, 12, and 15 of the Securities Act, 15 U.S.C. §§77k, 77l, and 77o, and SEC rules promulgated thereunder.

8.      This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §§77v, and/or §27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act, 15 U.S.C. §77v, and/or §27 of the Exchange Act, 15 U.S.C. §78aa, because the acts and transactions giving rise to the violations of law complained of herein occurred, in part, in this District, and certain Defendants reside and/or transact business in this District.  In addition, the Company's principal executive offices are located in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

### A.      Plaintiff

11.     Plaintiff purchased Ibotta securities during the Class Period, as described in the Certification attached hereto and incorporated herein by reference, and suffered damages as a result

of the violations of the federal securities laws alleged herein.  Plaintiff suffered economic losses when the true facts about the Company's business, financial condition, and operations were disclosed and the artificial inflation was removed from the price of Ibotta's securities.

### B.    Defendants

#### 1.    Ibotta

12.    Defendant Ibotta provides promotional services to publishers, retailers, and advertisers through the IPN, which includes its direct-to-consumer ("D2C") mobile, web, and browser extension properties and its network of third-party publisher properties.  Ibotta's common stock trades on the New York Stock Exchange (the "NYSE") under the symbol "IBTA."

#### 2.    The Individual Defendants

13.    Defendant Bryan W. Leach founded Ibotta in 2011.  Since then, Leach has served as the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Company's Board of Directors (the "Board").

14.    Defendant Sunit S. Patel served as the Company's Chief Financial Officer ("CFO") from February 2021 until his resignation on March 14, 2025.

15.    Stephen Bailey ("Bailey") served as a director of the Company at the time the Registration Statement was declared effective.  Defendant Bailey reviewed and contributed to the Registration Statement and is identified therein as a director.

16.    Amanda Baldwin ("Baldwin") served as a director of the Company at the time the Registration Statement was declared effective.  Defendant Baldwin reviewed and contributed to the Registration Statement and is identified therein as a director.

17. Amit N. Doshi ("Doshi") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Doshi reviewed and contributed to the Registration Statement and is identified therein as a director.

18. Thomas Lehrman served as a director of the Company at the time the Registration Statement was declared effective. Defendant Lehrman reviewed and contributed to the Registration Statement and is identified therein as a director.

19. Valarie Sheppard ("Sheppard") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Sheppard reviewed and contributed to the Registration Statement and is identified therein as a director.

20. Larry W. Sonsini ("Sonsini") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Sonsini reviewed and contributed to the Registration Statement and is identified therein as a director.

21. The Defendants named in ¶¶13-20 above are collectively referred to herein as the "Individual Defendants." The Individual Defendants each signed, or authorized the signing of, the Offering Documents, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the Offering and the Offering Documents, and/or attended or contributed to road shows and other promotions to meet with and present favorable information to Ibotta investors, all motivated by their own and the Company's financial interests.

**3.      The Underwriter Defendants**

22. The following underwriters were also instrumental in soliciting and making the securities in the Offering available to the investing public:

| | |
|---|---|
| Goldman Sachs & Co. LLC | 2,230,639 |
| Citigroup Global Markets Inc. | 1,574,569 |
| BofA Securities, Inc. | 787,285 |
| Evercore Group L.L.C. | 492,052 |
| UBS Securities LLC | 492,052 |
| Wells Fargo Securities, LLC | 492,052 |
| Citizens JMP Securities, LLC | 164,017 |
| Needham & Company, LLC | 164,017 |
| Raymond James & Associates, Inc. | 164,017 |

23.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Goldman Sachs served as a joint representative of all the underwriters.  Goldman Sachs also participated in conducting and promoting the Offering.  Goldman Sachs's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Goldman Sachs is headquartered in New York, New York.

24.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Citigroup served as a joint representative of all the underwriters.  Citigroup also participated in conducting and promoting the Offering.  Citigroup's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Citigroup is headquartered in New York, New York.

25.     Defendant BofA Securities, Inc. ("BofA") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the

Company's false and misleading Offering Documents. BofA served as a joint representative of all the underwriters. BofA also participated in conducting and promoting the Offering. BofA's participation in the solicitation of the Offering was motivated by its financial interest. Defendant BofA is headquartered in New York, New York.

26.     Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Evercore also participated in conducting and promoting the Offering. Evercore's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Evercore is headquartered in New York, New York.

27.     Defendant UBS Securities LLC ("UBS") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. UBS also participated in conducting and promoting the Offering. UBS's participation in the solicitation of the Offering was motivated by its financial interest. Defendant UBS is headquartered in New York, New York.

28.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Wells Fargo also participated in conducting and promoting the Offering. Wells Fargo's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Wells Fargo is headquartered in Charlotte, North Carolina.

29. Defendant Citizens JMP Securities, LLC ("Citizens") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Citizens also participated in conducting and promoting the Offering. Citizens's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Citizens is headquartered in San Francisco, California.

30. Defendant Needham & Company, LLC ("Needham") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Needham also participated in conducting and promoting the Offering. Needham's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Needham is headquartered in New York, New York.

31. Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Raymond James also participated in conducting and promoting the Offering. Raymond James's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Raymond James is headquartered in St. Petersburg, Florida.

32. The Defendants listed in ¶¶23-31 are collectively referred to herein as the "Underwriter Defendants."

33. Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In

addition, although not an element of Plaintiff's Securities Act claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

34. Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees.

35. As underwriters, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

36. Representatives of the Underwriter Defendants also assisted Ibotta and the Individual Defendants plan the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company; an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

37.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Ibotta's management, directors, and lawyers to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Ibotta's securities would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Ibotta would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Ibotta's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Ibotta's undisclosed then-existing problems and plans and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

38.     The Underwriter Defendants also demanded and obtained an agreement from Ibotta under which Ibotta agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

39.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the Offering so that they, and the Individual Defendants, could offer to sell, and did sell, Ibotta shares to Plaintiff and the members of the Securities Act Class pursuant (or traceable) to the Offering Documents.

## SUBSTANTIVE ALLEGATIONS

40.     Ibotta's IPN is an AI-enabled technology platform that allows CPG brands to deliver digital promotions to consumers via a network of publishers in a coordinated fashion and on a fee-per-sale basis.  Generally, redemptions grow as Ibotta increases budgets with existing

clients and/or adds new CPG brands as clients. In addition, redemptions grow from adding publishers, redeemers, and/or increase engagement from existing redeemers.

## SECURITIES ACT CLAIMS

### Materially False and Misleading Statements

41.     The Class Period begins on April 18, 2024, when Defendants filed with the SEC the final prospectus on Form 424B4 for Ibotta's IPO. Therein, Defendants repeatedly touted Ibotta's data measurement technology to distinguish the Company from other advertisers, such as those offering programmatic ads, stating in relevant part:

> **Audience scale capable of moving substantial sales volumes for clients** . . . . Overall, the network reaches over 200 million U.S. consumers. We believe this scale positions the IPN as a viable alternative to top-of-funnel media tactics such as TV and programmatic media.

42.     Repeatedly, the Offering Documents claim that the Company uses "cloud-based, serverless technology to ingest and process vast amounts of cross-retailer, item-level purchase data in near real-time," and that the Company's data measurement tools enable clients to "set up and measure the performance of campaigns across [Ibotta's] network in real-time" by allowing them to track which "offers have been selected by consumers in real-time, match offers to the specific qualifying products that have been purchased, and log redemptions accordingly." Further, Ibotta's "real-time campaign tracking allows clients to monitor the success of their campaigns."

43.     The statements identified in ¶¶41-42 above were materially false and misleading because, unlike companies that offer programmatic advertising, Ibotta did not offer its clients the ability to "set up and measure the performance of campaigns across [Ibotta's] network in real-time." Rather, Ibotta's data measurement technology could not track client campaign and consumer data in real-time in the weeks leading up to the IPO and throughout the Class Period.

44.     Defendants also touted the revenue Ibotta earned from redemptions on its D2C platform in the final prospectus on Form 424B4.  Specifically, Defendants claimed that revenue from Ibotta's D2C platform benefitted from new partnerships with large clients such as Walmart, stating in relevant part:

> For 2023 and 2022, our third-party publisher redemptions were approximately 111.6 million and 13.8 million, respectively, primarily driven by the expansion of redemptions through Walmart, which initially launched in the third quarter of 2022 to members of Walmart's paid membership program, Walmart+, and expanded to other Walmart customers with a Walmart.com account in the third quarter of 2023.

*    *    *

> Ibotta D2C revenue also benefited as a result of the Walmart launch from improved the quantity and quality of offers available on D2C properties.

45.     The Offering Documents also touted Ibotta's D2C platform as an advantage over competitors and other publishers, stating in relevant part:

> **Ability to access national promotions budgets, leveraging our large D2C business.** Ibotta's sales team has over a decade of experience building relationships with thousands of CPG brands and sourcing offers for placement on our widely used app, and more recently for distribution across our broader network. Other digital promotions companies either do not have comparable D2C properties, or have properties that reach much smaller audiences. Without a meaningful D2C presence, competitors have difficulty securing cross-retailer, national offers. Instead, they are forced to rely heavily on the retailer's own merchant teams to source offer content on their behalf. This gives Ibotta an advantage in winning business with new retailer publishers because our competitors cannot match the same volume of incremental, national offers.

[Emphasis in original].

46.     The statements identified in ¶¶44-45 above were materially false and misleading because the shift in Ibotta's business model away from its D2C platform to third-party platforms hindered revenue growth.

47.     In addition to the foregoing, for those statements alleged to have been misleading in the Offering Documents related to Ibotta's data measurement technology, Defendants were required to disclose the above material information for at least two additional independent reasons. First, Item 303 of SEC Regulations S-K, 17 C.F.R. §229.303 ("Item 303"), imposed an independent duty on Defendants to disclose in the Offering Documents any known trends or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on net sales, revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.  As of the IPO and the issuance of the Offering Documents, Defendants were aware, but did not disclose, that Ibotta's data measurement technology could not track client campaign and consumer data in real-time, and that the inability was likely to have a material adverse effect on Ibotta's future performance.

48.     Second, the failure of the Offering Documents to disclose material adverse information related to Ibotta's data measurement technology also violated Item 105 of SEC Regulations S-K, 17 C.F.R. §229.105 ("Item 105").  Specifically, Item 105 provides, in pertinent part, that the "Risk Factors" section of offering documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describes the risk.  The Offering Documents' discussion of risk factors are themselves materially misleading because they provide generic statements of potential or contingent risk yet fail to disclose that the potential future adverse impacts described were already occurring at the time of the IPO.  For example, the Offering Documents purport to warn:

> We have scaled our business rapidly, and significant new platform features and solutions have in the past resulted in, and in the future ***may*** continue to result in,

> operational challenges affecting our business. Developing and launching enhancements to our platform and new solutions on our platform may involve significant technical risks and upfront capital investments that *may* not generate return on investment. We *may* use new technologies ineffectively, or we *may* fail to adapt to emerging industry standards. *If* we face material delays in introducing new or enhanced platform features and solutions or *if* our recently introduced solutions do not perform in accordance with our expectations, the publishers, CPG brands, retailers, and consumers that use our platform may forego the use of our solutions in favor of those of our competitors.

[Emphasis added].

At that time, however, Defendants were already aware that Ibotta's data measurement technology could not track client campaign and consumer data in real-time.

49.     And, for those statements alleged to have been misleading in the Offering Documents related to the shift in Ibotta's business model away from its D2C platform to third-party platforms, Defendants were required to disclose the above material information for at least two additional independent reasons.  First, Item 303 imposed an independent duty on Defendants to disclose in the Offering Documents any known trends or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on net sales, revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.  As of the IPO and the issuance of the Offering Documents, Defendants were aware, but did not disclose, that Ibotta's business model had shifted away from its D2C platform to third-party platforms and that the shift was likely to have a material adverse effect on Ibotta's future performance.

50.     Second, the failure of the Offering Documents to disclose material adverse information related to the shift in Ibotta's business model away from its D2C platform to third-

party platforms also violated Item 105. Specifically, Item 105 provides, in pertinent part, that the "Risk Factors" section of offering documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describes the risk. The Offering Documents' discussion of risk factors are themselves materially misleading because they provide generic statements of potential or contingent risk yet fail to disclose that the potential future adverse impacts described were already occurring at the time of the IPO. For example, the Offering Documents purport to warn:

> Our business, financial condition, results of operations, and prospects will be adversely affected *if* we do not renew, maintain, and expand our relationships with existing publishers and add new publishers to the IPN. We provide offers on a white-label basis to Walmart Inc., a Delaware corporation (Walmart), Dollar General Corporation (Dollar General), Shell plc (Shell), Exxon Mobil Corporation (Exxon), The Kroger Co., (Kroger), and other retailers. We have invested heavily in the IPN, which matches and distributes offers across a variety of publisher sites. Our contract negotiation process with such publishers *can* be lengthy, which *can* contribute to variability in our revenue generation and makes our revenue difficult to forecast. As a result, it is difficult to predict our ability to form new partnerships with publishers, and our revenue could be lower than expected, which would have an adverse effect on our business, financial condition, results of operations, and prospects.

> We match and distribute our digital offers through large retailer publishers, grocery retailers, and Ibotta D2C properties. *If* we do not renew, maintain and expand these relationships or add new publishers, our business will be negatively affected. We rely heavily on our publishers to match and distribute our digital promotions content, with a substantial portion of our white-label redemptions originating from offer selections on their websites and mobile applications . . . .

> *   *   *

> Publishers *may* also ask to modify their agreement terms in a cost-prohibitive or strategically detrimental manner when their agreements are up for renewal. Our inability to maintain our relationships with our publishers on terms consistent with or better than those already in place and that are otherwise favorable to us *could* increase competitive pressure and/or offering pricing, and otherwise adversely affect our business, financial condition, results of operations, and prospects. Retailer consolidation *may* also result in a decrease in or cessation of engagement

> with Ibotta, or result in Ibotta receiving less favorable contract terms with the consolidated entity. Publishers have and *could* in the future also experience downturns, store closures, or failures (including due to macroeconomic pressures) of their own businesses, or fail to adopt our additional offerings or fulfillment methods, or cease using Ibotta altogether for many reasons.

[Emphasis added].

At that time, however, Defendants were already aware that Ibotta's business model was shifting away from its D2C platform to third-party platforms.

### The Truth Emerges

51.     Despite repeatedly (and misleadingly) claiming that Ibotta's data measurement system provided accurate, precise, and real time measurement, differentiating it from competitors using programmatic advertising, the truth began to be revealed on November 13, 2024, during the third quarter 2024 earnings call, when Leach revealed to investors that, in 2025, the Company would undertake initiatives designed to: (1) "improve the rigor and credibility of our measurement framework, allowing our clients to track how many incremental sales they are delivering in near real time"; (2) "increase the efficiency of our campaigns by delivering the right offer to the right consumer at the right time"; and (3) "mak[e] it easier for our clients to do business with us."

52.     To achieve those goals, Leach stated Ibotta would introduce initiatives in 2025 that would increase measurability and precision "in near real time."  Such initiatives would shift the industry away from annual budgets to more "always on" spending based on incremental spending data, which is central to programmatic advertising.  In fact, Leach told investors he wants Ibotta to be in the "pantheon" of programmatic advertisers:

> But we want to be earning our place in the pantheon of the Facebooks, the Trade Desks the Googles of the world, and that's done by having incredible measurement framework that's validated by third-party companies and that is accepted by the people in the internal measurement teams of these companies.

53.     During the same earnings call, Defendants also began to reveal that clients had begun moving away from Ibotta's D2C platform in favor of their own platforms, thereby reducing revenue generated from redeemers on Ibotta's D2C platform.  For example, during the earnings call associated with the release of Ibotta's financial results for third quarter 2024, a securities analyst asked whether Ibotta prioritized third-party platforms or its D2C platform when there was a supply-demand imbalance, such as the one that occurred during the quarter.  In response, Leach stated that Ibotta does not prioritize and that it is more likely the D2C platform would have less supply because it costs more to run campaigns on the D2C platform and because the distinction between the two ultimately is not "terribly consequential."

54.     Leach continued, in relevant part:

> We focus on overall redemption revenue. So we're not trying to steer content toward the D2C or the third party, which means that if we have a massive amount of redeemers on third-party gobbling up offers, then so be it, particularly because there's a very low or no cost of acquisition in those environments versus the higher cost of acquisition on D2C. I suppose, we could kind of earmark a budget for D2C, but we don't do that. It's one of the reasons why if I had it to do over again, I'm not sure I would really break that out because it's not terribly consequential.
>
> Our brand partners don't say, well, I want this much on D2C and this much on third party. They say, I need 1 million units at this cost per incremental unit go, right? And so yes, it's absolutely -- the explanatory factor for D2C is sole -- almost sole factor is inventory availability. If a campaign a year ago would have stayed live for 16 days and now it stays live for 12 days or 13 days, that is the reason why redemption revenue on D2C is lower. And because that's all coming out of the same budget, that's exactly why.

55.     On this news, the Ibotta's stock price fell $9.38, or nearly 13%, to close at $65.55 on November 14, 2024.

56.     The truth continued to emerge on February 26, 2025, after market hours, when the Company issued a press release on a Form 8-K filed with the SEC reporting its financial results

for fourth quarter 2024 and full year 2024, respectively. During the associated earnings call, Leach explained in greater detail just how deficient Ibotta's data measurement technology actually was, stating that "it has become clear that we need to bring to market a more rigorous form of measurement that goes beyond the industry standard return on ad spend, or ROAS, framework." Leach continued, in relevant part:

> In terms of innovation, we believe we're on the cusp of reshaping our industry and breaking out of the promotions category. As our new measurement tools allow us to demonstrate that we are delivering incremental revenue growth that is also contribution margin-positive on every transaction, we believe our clients will grow their investments on the platform. In this way, we believe our company can follow a similar trajectory to other performance marketing platforms that have taken off once credible measurement has been established.

> By introducing a more programmatic media buying interface, we will also make it easier for brands and their agencies to invest on our network. And that, in turn, should help us get better at forecasting our business.

57. Leach also announced that Ibotta would transform into a programmatic advertising company, which shows that, at the time of the IPO, Ibotta's data measurement infrastructure was not suited for heavy reliance on third party platforms without data from its D2C platform to supplement. Leach stated, in relevant part:

> Goal Number 2: change the way clients buy on our network. This means getting away from annual promotions budgets and evolving our network into a more programmatic interface for buying performance-based media through our Campaign Manager product.

> *   *   *

> With regard to Goal Number 2, we're also in the process of upgrading Campaign Manager to support a more rich programmatic buying experience, including the automatic configuration of offers and more self-service features. In the future, we anticipate that our clients will be able to more easily sign up, fund, set up, measure and optimize campaigns with us, all without needing the same level of time-intensive back-and-forth with our sellers and account managers.

58.     On this news, Ibotta's stock price fell $29.08, or nearly 46%, to close at $34.09 on February 27, 2025.

59.     By the commencement of this Action, Ibotta's shares traded as low as $32.56, or a 63% drop from the $88 offering price.  All told, investors have lost hundreds of millions of dollars.



## CLASS ACTION ALLEGATIONS

### Securities Act Claims

60.     Plaintiff brings this Action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Ibotta securities between April 18, 2024, and February 26, 2025, both dates inclusive, including in, pursuant to, and/or traceable to the Offering.

61.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Ibotta, members of Ibotta's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Ibotta.

62.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the

NYSE, a national securities exchange. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the Class. Millions of Ibotta shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Ibotta or its transfer agent and may be notified of the pendency of this Action by mail, using a form of notice similar to that customarily used in securities class actions.

63.    Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

64.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants violated the Securities Act;

(c)    whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(d)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     whether the price of Ibotta's securities was artificially inflated; and

(g)     the extent of damage sustained by Class members and the appropriate measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

## CLAIMS FOR RELIEF

### Securities Act Claims

### COUNT I
### For Violations of §11 of the Securities Act
### (Against All Defendants)

66.     Plaintiff repeats and realleges each and every allegation contained in ¶¶41-65 as if fully set forth herein.

67.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

68.    The Offering Documents are inaccurate and misleading, containing untrue statements of material facts, omitting facts necessary to make the statements made therein not misleading, and omitting to state material facts required to be stated therein.

69.    The Company is the registrant of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Ibotta is liable under §11 of the Securities Act to Plaintiff and the Class.

70.    The Individual Defendants each signed the Offering Documents and/or were identified, with their consent, as director designees in the Offering Documents, becoming Directors on Ibotta's Board upon the SEC declaring the Offering Documents effective, and caused the Offering Documents to be issued.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and to ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the Offering Documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and should have known of the material fact necessary to make the statements made

therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

71.     The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents, and the failure of these documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

72.     Defendants acted negligently in preparing the Offering Documents. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, without omission of any material facts, and not misleading. In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

73.     By reasons of the conduct herein alleged, each Defendant named in this Count violated §11 of the Securities Act.

74.     None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements.   Rather, each such statement concerned existing facts.   Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

75.     Plaintiff sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

76.     This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

77.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**For Violations of §12(a) of the Securities Act**
**(Against the Individual Defendants)**

78.     Plaintiff repeats and realleges each and every allegation contained in ¶¶41-77 as if fully set forth herein.

79.     By means of the defective Prospectus, Defendants promoted, solicited, and sold Ibotta securities to Plaintiff and other members of the Class.

80.     The Prospectus for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.   Defendants owed Plaintiff, and the other members of the Class who purchased Ibotta securities pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus,

to ensure that such statements were true, and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

81.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Ibotta securities.

82.     By reason of the conduct alleged herein, Defendants violated §12(a)(2), 15 U.S.C. §77l(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Ibotta securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold Ibotta securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares and hereby tender their Ibotta securities to Defendants sued herein.  Class members who have sold their Ibotta securities seek damages to the extent permitted by law.

### COUNT III
### For Violations of §15 of the Securities Act
### (Against the Individual Defendants)

83.     Plaintiff repeats and realleges each and every allegation contained in ¶¶41-82 as if fully set forth herein.

84.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class against each of the Individual Defendants.

85.     The Defendants named in this Count were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised same over the Company to cause it to engage in the conduct complained of herein.  Similarly, each Defendant named in this Count not only controlled those subject to liability as primary violators of §11 of the Securities Act alleged in Count I above, but they also directly participated in controlling Ibotta by having signed or authorized the signing of the Offering Documents and authorizing the issuance of Ibotta securities to Plaintiff and members of the Class.

86.     As control persons of Ibotta, each of the Defendants named in this Count are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Ibotta for its violations of §11 of the Securities Act.

## EXCHANGE ACT CLAIMS

### Materially False and Misleading Statements

87.     Throughout the Class Period, Defendants Leach and Patel repeatedly told investors that Ibotta's clients had provided Ibotta with budgets sufficient to generate redemption revenue in line with redeemer growth through the end of 2024.  For example, on May 30, 2024, after market hours, Ibotta issued a press release on a Form 8-K filed with the SEC containing its investor presentation and reporting its financial results for first quarter 2024.  During the associated earnings call on the same day, Leach touted his visibility of and confidence in Ibotta's clients increasing their budgets as the Company adds redeemers:

> I do think that in terms of visibility and in terms of just continued investment, look, brands are looking for an at-scale place where they can earn and where they can put

money to work where it's completely measurable and where it's all charged on a fee per sale basis. The more we add redeemers, that's the key thing because the redeemers are what attract those brand dollars and we've always seen throughout the history of the company that as you build that scale, while maintaining the efficiency, those investments are more and more attractive and get made in larger and larger amounts.

In terms of the visibility that we have to that [*i.e.*, clients increasing their budgets as Ibotta adds redeemers], there are a number of different ways that we track that. I mean we know when a campaign is running the breadth, the quality of that campaign, and we are always encouraging our clients to use best practices in a way that is the most advantageous for both them and the ultimate end consumer. And we also have visibility as we enter into partnerships with companies that are going to use us with a seasonal calendar, and we can see, okay, we know that they're going to spike during these periods of time during the year. And every company is different. We work with 750 different clients. In some cases, we have more visibility; in some cases, less. But overall, we feel good about the environment being one in which as long as we do our part in growing redeemers and those addressable audiences that we'll have plenty of interest from the advertiser side.

88.    On August 13, 2024, after market hours, the Company issued a press release on a Form 8-K filed with the SEC reporting its financial results for second quarter 2024.  During the associated earnings call on the same day, Leach touted three current, client-related trends he told investors would continue as tailwinds going into 2025.  Leach stated, in relevant part:

First, there is a growing desire within CPG companies to use digital promotions to recapture consumers who are price-sensitive, many of whom have trended away from national brands and toward private label alternatives. Several of our CPG clients have recently commented publicly that they plan to increase promotional spending in the back half of the year to combat weaker volumes and respond to increasing price sensitivity among consumers.

\*    \*    \*

Second, many large CPG companies are pulling back on marketing investments that have a less definite return on investment. In this environment, we believe our business is especially well positioned because we offer a pay-per-sale alternative that derisks their marketing investments and delivers measurable incremental sales in a highly cost-effective manner . . . .

Third, we continue to hear from CPG leaders that they want to see a much higher degree of rigor when it comes to measuring the return on investment of their marketing spend . . . .

89.    Later on in the call, Patel confirmed that clients were increasingly interested in increasing their budgets in line with redeemer growth.  Patel stated, in relevant part:

Ultimately, however, advertiser budgets follow audiences. And thus, we expect client budgets to grow in proportion to the growth in redeemers network-wide as we've seen over the last couple of years.

*    *    *

We've literally more than doubled the business over the last couple of years and still [are] seeing significant growth. So sometimes you might see slight lags. But as I was saying, we are seeing interest pick up a lot with our clients just here in this month. So over time, we've not had that issue that audiences have grown. We've generally been able to grow our budgets with our clients without much of a problem.

*    *    *

I mean if you look at our guidance, as I said, I mean based on our conversations with our clients, we think that the ads business is kind of where it will be, where it was in the second quarter and the third quarter. But what we are seeing -- we talk about the macro, but we are seeing just in the month of August, we've seen strong interest from clients in increasing the budgets, which is benefiting both our third-party publisher business and our D2C business. So it's a little beyond just a seasonal pickup. So I think that there are specific clients that talk to us just about getting volumes up without naming them. In the chickens category, for example, we just want to hit certain volumes.

90.    On November 13, 2024, after market hours, the Company issued a press release on a Form 8-K filed with the SEC reporting its financial results for third quarter 2024.  During the associated earnings call on the same day, Leach touted the growth of Ibotta's network and told investors that Ibotta's sales team had been successful at increasing clients' budgets throughout the year.  Leach stated, in relevant part:

We're expanding the surface area of our network and growing savings opportunities for consumers by making it easier to find and use our offers on our existing

29

publishers, adding new publishers and onboarding new CPG brand partners, while at the same time deepening the offer budgets we have with our existing partners.

\* \* \*

Now let's turn to our CPG clients. This year, we've seen a 65% increase in gross billings in our CPG redemption business year-to-date. This is the result of a lot of hard work by our sellers and account managers who've worked with our CPG clients to rapidly step up their investments in our fast-growing network. In many cases, when a new marketing channel is expected to scale rapidly, CPG brands take a wait-and-see approach, meaning they prefer to see that scale demonstrated before they allocate budgets large enough to take advantage of that scale. This can create temporary imbalances between the supply and demand for offers. This year, with our network capacity growing by such a large percentage relative to the prior year, our sellers have often found themselves sourcing incremental budgets midway through the year before the next planning cycle has come around. During the third quarter, we were successful in doing just that, unlocking major investments from several CPG brands that have previously invested only lightly on our platform.

91.     Leach also told investors that, although Ibotta worked through clients' budgets faster than anticipated, "many" of the Company's "top clients" intended to increase their budgets in 2025 to match the growing number of redeemers on the platform.  Leach stated, in relevant part:

As you can see from our Q3 results, we had a very strong end to the third quarter, moving through CPG promotional budgets faster than anticipated . . . We believe this downward pressure is temporary because we continue to see extremely high rates of client retention, indicating our clients are happy with the quality of what we are delivering. We have received indications from many of our top clients that they intend to increase their investment levels as their annual budgets reset in 2025.

92.     On the same call, Patel confirmed that clients would increase their budgets for 2025. As a result, revenue would "accelerate significantly in 2025."  Patel stated, in relevant part:

[W]e generated strong revenue growth with healthy adjusted EBITDA margins above the high end of our guidance range for Q3. For the reasons we have mentioned, we expect the revenue growth troughs in Q4 and accelerate significantly in 2025.

93.    The statements identified in ¶¶87-92 were materially false and misleading because Ibotta had "exhausted" its clients' budgets by third quarter 2024, negatively impacting fourth quarter 2024 revenue and expected first quarter 2025 revenue.

**The Truth Emerges**

94.    The market began to learn the truth during the earnings call associated with the release of the Company's second quarter 2024 financial results.  During the earnings call on August 13, 2024, after market hours, Patel reported that the Company had seen a "dramatic mix shift" in its business from D2C platform redemptions and ad revenue to third party redemptions.  Patel stated, in relevant part:

> 3PP redemption revenue comprised 47% of total revenue, with D2C redemption revenue representing 37%. This compares to 17% and 55% for 3PP and D2C non-GAAP redemption revenue, respectively, a year ago in second quarter of 2023 and also illustrates the dramatic mix shift in our business.
>
> *    *    *
>
> Redemptions for redeemer were 5.9, down 39% year-over-year, driven by the growth in third-party redeemers, which have a significantly lower redemption frequency as compared to our D2C redeemers. Redemption revenue per redemption was $0.92, down 4% year-over-year on a non-GAAP basis, primarily reflecting the mix shift toward third-party redemptions.

95.    On this news, Ibotta's stock price fell $15.53, or nearly 27%, to close at 42.66 on August 14, 2024.

96.    The market continued to learn the truth during the earnings call associated with the release of the Company's third quarter 2024 financial results.  During the call, Leach revealed Ibotta had "exhausted" its clients' budgets for 2024, which negatively impacted guidance revenue guidance for fourth quarter 2024.  Leach stated, in relevant part:

> I'd now like to briefly address some of the dynamics we've seen in our business more recently. As you can see from our Q3 results, we had a very strong end to the third quarter, moving through CPG promotional budgets faster than anticipated. As we look at the current quarter, however, despite it being our seasonally strongest quarter in the past, the rapid growth in our redeemer base, coupled with intense demand for savings on everyday items has caused us to exhaust 2024 budgets faster than anticipated. This has put short-term downward pressure on our redemption revenue in Q4, resulting in our guidance.

97.     On this news, the Ibotta's stock price fell $9.38, or nearly 13%, to close at $65.55 on November 14, 2024.

98.     The market continued to learn the truth during the earnings call associated with the release of the Company's fourth quarter 2024 and fiscal year 2024 financial results. Specifically, while discussing client budgets, Leach revealed that Ibotta had "fallen short" of expectations concerning fourth quarter 2024 and for 2025. Leach stated, in relevant part:

> Through the end of 4Q, we continued to face the same challenge we discussed on our last earnings call relating to the depletion of offer budgets over the course of 2024. Entering 2025, as expected, many of our top clients increased their Ibotta budgets to take advantage of our larger audience of redeemers. Others continued to have always-on content with us.
>
> Nonetheless, we have still yet to see the overall increase in spending that we anticipated.

99.     Leach attributed this failure to Ibotta's inability to "persuade [] clients to set aside budgets in anticipation" of redeemer growth, "rather than a full planning cycle after they have seen it."

100.     On this news, Ibotta's stock price fell $29.08, or nearly 46%, to close at $34.09 on February 27, 2025.

## CLASS ACTION ALLEGATIONS

### Exchange Act Claims

101.    Plaintiff brings this Action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Ibotta securities between April 18, 2024, and February 26, 2025, both dates inclusive, including in, pursuant to, and/or traceable to the Offering.

102.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Ibotta, members of Ibotta's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Ibotta.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NYSE, a national securities exchange.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the Class.  Millions of Ibotta shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Ibotta or its transfer agent and may be notified of the pendency of this Action by mail using a form of notice similar to that customarily used in securities class actions.

104.    Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.  Further,

Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

105.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the members of the Class are:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants violated the Securities Act;

(c)    whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(d)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    whether the price of Ibotta's securities was artificially inflated; and

(g)    the extent of damage sustained by Class members and the appropriate measure of damages.

106.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

## CLAIMS FOR RELIEF

### Exchange Act Claims

### COUNT IV
**For Violations of §10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against the Exchange Act Defendants)**

107.    Plaintiff repeats and realleges each and every allegation contained in ¶¶87-106 as if fully set forth herein.

108.    This Count is asserted on behalf of all members of the Class against Defendants Ibotta, Leach, Lehrman, and Patel for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

109.    These Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (b) caused Plaintiff and the other members of the Class to purchase Ibotta shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

110.    During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

35

111.   These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ibotta securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

112.   These Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Ibotta as specified herein.

113.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Ibotta's value, performance, and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Ibotta and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Ibotta securities.

114.   As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain

and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its securities. As demonstrated by these Defendants' omissions and misstatements of the Company's business strategy, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Ibotta's securities was artificially inflated. In ignorance of the fact that market prices of Ibotta's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to, or recklessly disregarded by, these Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired Ibotta securities at artificially high prices and were, or will be, damaged thereby.

116. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class

would not have purchased, or otherwise acquired, their Ibotta securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

117.    By virtue of the foregoing, these Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

118.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

119.    This Action was filed within two years of the discovery of the fraud and within five years of each Plaintiff's purchase of securities, giving rise to the cause of action.

## COUNT V
### For Violations of §20A of the Exchange Act
### (Against Defendant Lehrman)

120.    Plaintiff repeats and realleges each and every allegation contained in ¶¶87-119 as if fully set forth herein.

121.    This Count is brought against Defendant Lehrman under §20A of the Exchange Act, 15 U.S.C. §78t-1.

122.    Lehrman knew and recklessly disregarded, or should have known, that he had received material, adverse, non-public information and that he owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Ibotta to keep this information confidential.

123.    Nevertheless, while in possession of material, non-public, adverse information, Defendant Lehrman sold over 793,801 Ibotta shares.

124.     Unnamed Class members purchased shares contemporaneously with Lehrman's insider sales.

125.     By virtue of the foregoing, Defendant Lehrman, in connection with the purchase or sales of securities, by the use of the means or instrumentalities of interstate commerce, or of the mail, or a facility of a national securities exchange, directly or indirectly:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

126.     By virtue of the foregoing, Defendant Lehrman directly or indirectly violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

127.     By virtue of the foregoing, Defendant Lehrman is liable to Plaintiff and the Class for his insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

128.     When the material adverse information was eventually revealed, Ibotta's stock price declined and investors suffered economic loss, *i.e.*, damages.

**COUNT VI**
**For Violations of §20(a) of the Exchange Act**
**(Against Defendants Leach and Patel)**

129.     Plaintiff repeats and realleges each and every allegation contained in ¶¶87-128 as if fully set forth herein.

130.    Defendants Leach and Patel acted as controlling persons of Ibotta within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their high-level positions, agency, ownership, contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  These Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to, and/or shortly after, these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

131.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

132.    As set forth above, the Exchange Act Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

133.    By virtue of their positions as controlling persons, Defendants Leach and Patel are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

134.    This Action was filed within two years of the discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Exchange Act Class and the Securities Act Class, prays for relief and judgement as follows:

A.    Declaring that this Action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a representative of the Exchange Act Class and the Securities Act Class, and designating Plaintiff's counsel as Class Counsel for both the Exchange Act Class and the Securities Act Class;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Exchange Act Class against all Exchange Act Defendants, jointly and severally, for all damages sustained as a result of the Exchange Act Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

C.    Awarding Plaintiff, the Securities Act Class, and the Exchange Act Class their reasonable costs and expenses incurred in this Action, including attorneys' fees and expert fees;

D.    Awarding rescission or a rescissionary measure of damages; and

E.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

DATED:  May 21, 2025                    */s/ Rusty E. Glenn*
                                        Rusty E. Glenn (No. 39183)
                                        **SHUMAN, GLENN & STECKER**
                                        600 17th Street, Suite 2800 South
                                        Denver, CO 80202

Telephone: (303) 861-3003
Facsimile:  (303) 356-7849
rusty@shumanlawfirm.com

*Local Counsel for Plaintiff Quinton Valentine*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Matthew A. Peller (No. 2580059)
Nicholas S. Bruno (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
mpeller@scott-scott.com
nbruno@scott-scott.com

*Counsel for Plaintiff Quinton Valentine*